The Honorable, the Judges of the United States Court of Appeals for the Fourth Circuit. Ms. Hernandez? Yes. Good morning. May it please the Court? My name is Jill Hernandez and I represent the appellant, Muminatou Bah. I will reserve seven minutes for rebuttal. Respectfully, Bah's Title VII and Rita claims should have survived summary judgment based on this Court's holding in Wanamaker and Driscoll. As in Wanamaker, Bah provided ample record evidence to support that SBOC's proffered neutral reasons for termination were probative of pretext. First, Bah offered circumstantial evidence of racial animus based on racist comments made by a person influential to the decision-maker, Frank Taylor, whose relationship to SBOC's ownership dates back 50 years. In fact, SBOC's goal for Store 98 from the date it opened were to be in the hands of white management, as evidenced by Taylor's warnings. I thought the centerpiece of the reason for termination were the conditions, the candidly horrendous conditions at Store 80 that that place was used for in connection with drug distribution, gun distribution, and mis-selling of cigarettes and illegal cigarettes. And all of it was totally out of control, and how that could have gotten to, that's why they terminated her, right? So the question is if that's, you can take issue with that, too, but I assume that was the reason it was terminated. It was a pretty quick decision in response to that. There had been some prior warnings, but the question then is whether that was a pretext, and the district court, I thought, went through that and discussed why it wasn't. You can address that, but it seems to me it's, sure, you have activities with respect to Store 98, but she got that back. There was a debate as to who, she improved that store, she kept that store. But her downfall was really letting Store 90, and I must say what they described is pretty serious. Yes, thank you, Judge Niemeyer. The reality is that this case is exactly like Wanamaker. This woman, Ba, had been there for 11 years. She had not had any performance issues. She had had stellar evaluations every single year for performance evaluations from 2019 to 2021. I thought she got a whole new set of stores because of complaints about her. No, in fact, that particular evidence about being swapped for a new district, those details specifically indicate that she was doing a great job by holding individual store managers accountable for policy violations because they were stealing. I want to follow up on Judge Niemeyer's point here about the conditions in Store 80 were really horrendous. That would seem to me, given the magnitude of the problems there, would seem to me to be a perfectly justifiable reason to let someone go. You said, well, but you can't do that because we were somehow relying solely on the discriminator's testimony or whatever to resolve the case. But I don't think that that's really fair because the documentary evidence is quite extensive here. And in addition to the testimony, you have really voluminous documentary evidence, including investigation notes and written statements of witnesses and e-mails and text messages. And so the record here is much fuller and more complete and drawing on more different threads and strands of testimony than was the case in the Wanamaker decision. They weren't just relying in Wanamaker. They relied solely on the testimony of the very person accused of discrimination. But that's not here. That's not this case. The documentary testimony ranges far afield, which is much different from simply the sole testimony of the discriminator. And those conditions that existed in this store, really, that's not related to the testimony of the discriminator. Those conditions were there, and they were horrendous. And any company would want to say, you're the supervisor. You're responsible for what happened there. It hasn't been cleared up. And in addition, the record is replete with a consistent explanation on the part of the company about communications problems. They're not hopping from one reason to another. They're talking about communications problems with the people that she's supposed to be supervising. And so to say that this is a Wanamaker case, just I don't see how they're similar at all. Your Honor, if I may just explain. It will certainly come clear as I can provide a little bit of the timeline. First, all of these details go to shifting and conflicting motives, which we know from Wanamaker is probative of pretext. Unlike in Wanamaker, where Wanamaker was given one reason for her termination, here, SBOC articulated no reason for Baugh's termination. Shifting two weeks after her termination. You just said the defendant didn't give any reason? That is correct. That is correct. In fact, on July 7, 2022, when she was terminated, she was given a singular page report that had policy violation 11 and policy violation 29. All that said, all that meant, and she specifically, Your Honors, she specifically asked for an explanation on why she was being terminated. And they wouldn't give her one. In fact, Manley Clark, the decision maker, specifically advised her to go ahead and call HR the very next day. She calls HR. And that HR lady, who was directed just the night before termination, was directed to go ahead and find any information to corroborate or justify Manley Clark's decision. Well, Manley spent a whole page testifying as to why he fired her. And he concluded that he's never seen, he said there was such a complete lack of control there, I'd never seen anything like it in my life. And Shannon and I decided that that was the reason for termination at that point. Your Honor, but that is exactly like Wanamaker, where in Wanamaker, this court held that where the decision maker is directly criticizing the employee's performance, and that employee is directly disputing that evidence and also accusing that person.  We're talking about hiring somebody that murdered his wife. We're talking about shortages in the cash register. We're talking about selling cigarettes illegally. We're talking about selling drugs. I mean, he lists it right here on page 2058, the whole schmear. Your Honor, let me just say. And nobody has disputed any of that. What we can say is this. As it relates to, I said, the very first day she was terminated, there was none of this information that was given to her. Well, that's a different issue. I'm just questioning why they fired her. So then two months later, after her termination and during her unemployment hearing, that information relating to Store 80 came up for the very first time. And then two years later, during her deposition, there was now a new reason that was serious misconduct. This was the shifting and conflicting motives probative pretext. In fact, as it relates to Store 80, she, during her deposition, responded to every single issue and how she addressed it. Why? Because she had eight to nine stores under her supervision. And whenever HR would get a hold of something or would hear something, they would direct her to investigate. And she did. She would address every single issue. As it goes to your point about the murder, there is no evidence in the record that she was responsible for hiring this person.  He said she was totally out of control. That this store, I mean, it's quite a problem. There was a cigarette investigation in which she had complete lack of control or oversight of her stores. There were vacancies in her management spots. They were having issues filling. Their things ultimately got out so out of control that in Store 80, where there was a complete lack of oversight of patrol whatever, there was cash shortage. There were employees trying to buy and sell guns. Drug issues in there. A drunk employee urinating on the floor. There was an employee that was previously terminated and rejected from being hired. That somehow got hired into that store. Just to show the character of what, and it just goes on. And then that person happened to have murdered his, quote, wife, quote, boyfriend. With all due respect, Your Honor, she was never given, there was no contemporaneous documentation. What's that? There was never. It's a question of why they fired her. Consistent with Wanamaker, there has to be contemporaneous documentation. We know from Wanamaker that the decision maker that is attempting to build a file of issues that have never been discussed with a plaintiff is probative of pretext. When there is documentation that is created at the time of termination where they're relying on past events and there's no contemporaneous documentation, that is probative of pretext. And that was present in this matter. Your Honor, may I? I'm sorry. I was going to say it was true that a white individual ended up replacing Bob. A company says it's undisputed that this occurred only after two individuals within Bob's protected class had declined the job. And that was just another fact, I think, that supports what the trial judge, the very able trial judge, had done here. I'm just wondering, that seems to sort of defang the whole idea that this was racially motivated because two black women were asked to take the job. And the white individual only replaced Bob after the two women within Bob's protected class had declined it. So, you know, the various performance reports seem to me to be consistent in identifying a problem. In addition to Store 80, the one persistent criticism that arises is the problems that she had with communication issues. Were the communication issues, did they involve subordinates or did they involve, were they upstream communications issues? I'll ask the other side of this, but this one problem continues to surface. Your Honor, if I may, I realize that my time has expired and if I may address your question. Would you prefer to address it on rebuttal or would you want to address it now? I would prefer to address it now. Okay, that's fine. So. Then I'll take the time off your rebuttal. Thank you, Your Honor. The first point is that in terms of any contemporary, well, the communication issues, this woman for 10 over a decade working there and she had never had any formal write-ups. She had never had any sort of pips. She had nothing but positive feedback, including from Frank Taylor 30 days before her termination where he investigated all of her stores. The performance reviews declined toward the end of her tenure. And yet she still received a salary increase which was reserved only for individuals that were above, performing at above average skill and that was her. The comments were always stellar. She was doing a fantastic job. She had maintained a wonderful team. That she was amazing at finding shortages and inventory audits. All of this information about Store 80 came to light two months after her termination. She had never heard any sort of write-up, anything. In fact, as I stated, at the time of her termination, they didn't even give her reason. And she asked for it repeatedly. And then two years into the litigation and during her deposition, she is seeing for the very first time a draft termination report that says serious misconduct. She had never seen that. How is that any different from what happened in Wanamaker where the shifting and conflicting reasons by the company are demonstrative of pretext? That's exactly what we have here. And so summary judgment should have been denied because a rational jury could find in favor of the plaintiff. And that's what's really at issue. This is not about weighing the facts when they are conflicting. Thank you, Counsel. Thank you. Thank you very much, Your Honor. Mr. Pencook. Good morning, Your Honors, and may it please the Court, Nate Pencook on behalf of the Apelli Sampson Blade & Oil Company. Your Honors, this is a straightforward pretext appeal in which the district court faithfully applied well-settled Title VII jurisprudence and correctly found that the plaintiff had not established a genuine issue of material fact that the reasons for her termination provided by the company were pretext for race discrimination or for any qualifying complaints she may have made. The plaintiff asked this court to reverse the well-reasoned decision below for two reasons. One, based on a flatly incorrect representation of the facts and also by an unreasonable extension of the Wanamaker case as we just heard. Plaintiff's interpretation of Wanamaker would effectively eliminate summary judgment for employers if that were the case. This court should reject that argument. Now, the first argument I'd like to address from the briefing is that the, Ms. Baugh argues that because the district court found a prima facie case was made by Ms. Baugh, that its findings on pretext conflict. And they don't, Your Honor. That argument is based on a misapprehension of the McDonnell-Douglas test and the relative burdens at each stage. There's nothing that's inherently contradictory about a court finding, on the one hand, that the minimal prima facie burden has been met. And on the other hand, that the pretext burden was not met because the inquiry is different. At the pretext stage, what ultimately matters is the employer's honest belief. As this court noted in Semplewich, the court's focus at the pretext stage is on the employer's perception rather than the employee's self-assessment. And so, as an example, this court in Holland v. Washington-Holmes found that a plaintiff had made a prima facie case based on positive performance reviews, but ultimately that the plaintiff failed to prove that the reasons provided by the... I think we understand the legal framework. Yes, Your Honor. Why don't you get to the facts of the case. Sure, Your Honor. And perhaps the best way to address that is in the context of Wanamaker because this case has been analogized pretty heavily to that case. Wanamaker found pretext based on several reasons. First, there was discriminatory animus by the alleged decision-maker. We don't have that here, Your Honor. The decision-maker here, Manly Clark, is not somebody who the plaintiff alleged had it out for her. There's no evidence that this man made any sort of racist statements. And so it's very different from the employer decision-maker in Wanamaker for that reason. There's been a lot of discussion about the shifting and conflicting reasons provided. There was no shifting or conflicting reason provided here. The discussion of this draft report and the final report that she was given, which are two days apart, there's nothing inconsistent about those two. What were the communications issues that were referenced here? Were communications downstream with subordinates or upstream with supervisors? It was upstream with supervisors, Your Honor. Did they just not? Were the communications issues that were referenced that she failed to let them know what was going on within the different stores under her supervision? That's right, Your Honor. And this was an issue that was consistently noted in her performance reviews over the preceding years. Yeah, this wasn't something that just blossomed at the very last minute. It's a persistent comment. That's right, Your Honor. Throughout a good number of years. That's right. And, you know, another instance of poor communication actually occurred in June, which was the same month that all the issues at Store 80 became apparent, where Ms. Baugh was supposed to be out for the week, apparently worked that entire week after the company had already gotten coverage for her for that whole week, and at the end of the week after it was all said and done, she said, oh, I worked the whole week. You know, Ms. Shannon Herring, who was her direct supervisor, and Mr. Manley Clark, who was the decision maker, both told her that is a communication issue, that is a problem. All right, now what about the conditions? You've addressed a communications issue. What about the conditions in Store 80? Yes, Your Honor. The conditions at Store 80 were the worst that Mr. Clark had seen in his time with the company. The issues essentially demonstrated a lack of control over that store, but they were also exemplary of just the issues that she had with control over her district. And so the issues that were there were a store manager who was largely absent was soliciting his employees to buy guns for him that he claimed he wasn't able to purchase based on his citizenship status, and drugs for him, and in exchange he would mess with their time sheets to get them more money from the company. He was altering time sheets in return for drugs? Correct, Your Honor. You said mess with time sheets. You mean falsify time sheets? Correct, Your Honor. Consistently? Yes, Your Honor. How did this come to light? So it came to light when both that store manager and the employee who was involved made dueling complaints to the company's HR staff. Once those complaints became known, Ms. Herring and Ms. Thornton, who was the HR specialist, conducted an investigation. They interviewed those employees, and what came out in that investigation was that Ms. Baugh was aware of very many of the issues and said that she would tell her supervisor about it, talk to them about it, and nothing ever happened. That's why the employee, not the store manager, but the cashier, went directly to corporate. But the conditions in Store 80, they involved unlawful acts. Correct, Your Honor. I mean, we're not just talking about poor performance here. We're talking about illegality. Absolutely, Your Honor. Whether the company could simply avert its eyes and sweep under the rug activity that was in violation of very basic laws. Exactly correct, Your Honor. Were they ever reported to the authorities? That's not in the record, Your Honor. But the employees were known to the company. On this record, they weren't reported to the authority. I'm sorry? On this record, then, they were not reported to any authorities. Well, there's no evidence in the record one way or another. Any unlawful activities in Store 80, for example. There's no evidence in the record one way or another. You didn't turn anybody in. That's correct, Your Honor. At least there's no evidence of that in the record. But regardless, that is a key distinction between this case and the Wanamaker case because in the Wanamaker case, the plaintiff there failed to respond to an email in a single day. That is a far cry from issues at a store that are described as the worst that the company had ever seen. I'd like to address briefly, because it may appear from the briefing that the record is not clear on this draft report and the reasons being shifting and conflicting. The reasons provided in the draft report were more specific to Store 80, and they had all these investigation notes attached to them. But the final report was these two issues, the failure to communicate, the failure to ensure that the employees at the company were following policies, are part and parcel. What was she told when she was fired? When she was in the termination meeting, she was read that report that just said the two issues of failure to meet job responsibilities. But it's important to note that in Wanamaker. And Manley fired her? Yes, it was Manley Clark and John Clark who made the decision. Who was the other one? John Clark, the vice president of the company. So Manley, and what's in the record is Manley determined she needed to be terminated. And what about Shannon? She was also part of it, and she was part of the Store 80 investigation as well. Was Taylor part of it? Mr. Taylor was not part of the decision to terminate. Mr. Taylor was consulted after the decision had been made as to what should be put in the report, like essentially how it should read, and what should happen in the termination meeting. Am I correct that two black employees were offered this position to replace the plaintiff here, and they declined it, and then a white eventually accepted it? But there were two employees within the same protected class that were offered the position initially. Is that correct? That is correct, Your Honor. And we argued before the district court that that should mitigate the prima facie case, because that fourth step of circumstances that give rise to an inference of discrimination essentially looks to, okay, if the company had an issue with having a black employee, they replaced her with a white employee, and that's sort of prima facie evidence. But if the company made honest attempts to hire somebody in the same protected class, not because they were in the same protected class, but because they were the ones who had the most merit for the position, and those individuals declined, the company shouldn't be held liable for race discrimination based on that alone. Ultimately, the district court found that that was more appropriately considered at the pretext stage, and certainly we do not quibble with the decision that the district court made. Your Honors, I'd like to make it clear that there is no genuine dispute by Ms. Baugh that the issues at Store 80 actually occurred or that they were actually the basis of her termination. Going back to the case law that says it's the employer's honest belief that matters, there is no evidence that this reason was false. All she offers to rebut that is claiming that Wanamaker says you don't consider the employer's testimony whatsoever on summary judgment, which is flatly incorrect. And then also that she claims that she wasn't aware of these issues. That's exactly the problem that led to her termination. The company expected her to be aware of these issues, to be in the stores, to be talking to the employees, and to address things that are brought to her attention and to find things that had not been brought to her attention. Was it that she did not visit the store or that she visited the store and didn't pick up on the problems? Well, ultimately what the record reflects is there were several store managers who said, and this was following the store rides that Mr. Taylor did prior to this termination, there were complaints that they just never see Miss Baugh or don't really hear from her except for on very limited occasions. She didn't go to Store 80? Well, she was aware of issues at Store 80 and she was at Store 80, I believe, addressing issues related to a cash audit. But there were all these other issues which, if she was there, she would have knowledge of the store manager being in the office two or four hours every day as opposed to working full shifts and that sort of thing. Where was the Store 80? Store 80, it was in East Raleigh. East Raleigh. Yes, sir. To briefly address the Rita claim, Your Honor, ultimately the issues that led to her termination undercut her Rita claim, but what the district court found is that Miss Baugh had not made a qualifying complaint, and that was correct. What Miss Baugh argues now on appeal is that the Driscoll case essentially means that if she makes a complaint to anybody other than her supervisor, that that means that she's made a qualifying complaint. There's no evidence in the record here that she did make a complaint to anybody other than her supervisor during a relevant time frame. She raised a concern about store managers being paid more in the context of employee retention and competitiveness, but it was never made in the context of. There was an increase, wasn't there, after that? There was an increase, Your Honor. Yes, sir. However, there's no evidence that it led to any sort of investigation as to whether wage and hour laws were being complied with. It's essentially saying we're having a hard time recruiting store managers. I think we need to give them a little bit of a pay bump, or we're having a hard time retaining store managers. I think we need to give them a little bit of a pay bump. That sort of a suggestion doesn't rise to the level of a qualifying complaint in the same way that, for example, the complaint in Driscoll did, where the individual was complaining about a drunk employee on a construction site to the president of the company, and it was a persistent complaint that was made numerous times. We don't have that same issue here. Ultimately, Your Honors, this case ends where Store 80 begins. There is no evidence that the company didn't honestly believe these issues merited her termination, and there is no evidence that these issues did not occur. As such, the district court correctly found that Ms. Baugh had no competent evidence to counter that. Under McDonnell Douglas, under any reasonable reading of Wanamaker, and based on the undisputed record, the district court properly entered summary judgment, and that judgment should be affirmed. I'm happy to answer any questions you have. Thank you. All rise. Ms. Hernandez. Thank you very much, Your Honors. To first address the RITA issue, the district court incorrectly held that Baugh should have inquired into SBOC's legal obligations under the North Carolina Wage and Hour Act. Consistent with Driscoll, that is not the appropriate standard, that somehow that would have been Baugh's requirement to investigate what SBOC's obligations were. Additionally, as it relates to her complaints to Frank Taylor and Manley Clark, that they do not count, they were within the leadership. She was within that leadership command. She obviously had communications with her store managers. The store managers repeatedly complained about working long hours, 50, 60, 70 hours a week, and wanting to be paid overtime, and she was complying with the company's policy by communicating those concerns to upper management. She, at a leadership meeting, complained about the overtime pay that they wanted during, and it was with the president and the vice president, which then subsequently, from 2021, early 2022, the company made a change in policy, precluding store managers from recording their overtime hours so that it wasn't going to be documented. They probably wouldn't see it, and they wouldn't. You say precluding? Precluding. Precluding store managers. They couldn't document their overtime. That is correct. And it was because they were complaining constantly, seeing how many hours they were working and not getting paid the overtime. So what did the company do after Bob was complaining on their behalf? From now on, nobody's going to be writing down their overtime hours. That way it's not documented. They can't see it in any sort of investigation or further litigation. There is no evidence of what hours they are working. So it is absolutely not true that they didn't engage in further investigation and change the policy. Additionally, the district court respectfully incorrectly held that Bob's complaints were not part of that investigation. That's just not true. She did comply with these communications. And then going back to whether or not these two blacks were offered a position after they terminated her, there's no evidence that they offered two blacks the position and then that they rejected it. There's no evidence of that. The other thing is that — Where does it first appear? Where does it first appear? It appears in briefing, actually, because there's no evidence of that. And there should be contemporaneous — So you're saying that's not in the record? It's not in the record or contemporaneous documentation, I should say. Somebody made it up? I'm saying — If it's not in the record, how do you — It's probative of pretext. A rational jury should be able to decide whether or not that actually happened. And we don't have that in the record. The other thing to keep in mind is that Frank Taylor was influential to the decision-maker up until the date of termination. And he was the one who made decisions about Store 98 and that because of its location, very affluent area, predominantly white, that they could not hire blacks or Africans because they were dirty, smelly, and lazy. They had an image to uphold. And they did not want it to be referred to as a hood store. So following those very, very racist and offensive comments, it's what happened all thereafter. She was deprived of her ability to do what she was supposed to do, to be able to hire the most qualified individual, even if that meant that individual was black. They deprived her of that. They always pushed back. Then they tried to reassign her store to a white person. There were two black DMs. They could have immediately given that store of hers to another black DM. They never did that. There's no evidence in the record that they ever tried to reassign that Store 98 to another black person. And why? Because they didn't want it in the hands of a white manager. And then when she was terminated, the very next day, they offer it to a white person and that person accepts it. Then not a week later, they remove the black Store Manager from Store 98 and they give it to a white manager. All of this is probative of racial animus for unlawful discrimination. And with respect to Rita, she did absolutely what she had to do. She complained to upper echelon people, the President, the Vice President, the Director of Operations regarding the overtime issues. And to the extent that your honors have any further questions for me, I'm happy to answer them. Paul, do you have anything for Bob? Go ahead. All right, we thank you. We will come down and adjourn court and come down and brief counsel. I'd like to thank also our able courtroom deputy for helping things move so smoothly. Thank you, your honors. Thank you very much. This honorable court stands adjourned until tomorrow morning. God save the United States and this honorable court.
judges: J. Harvie Wilkinson III, Paul V. Niemeyer, Robert B. King